# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| HUMBERTO GOMEZ OVIEDO, | : | Case No. 1:22-cv-214 |
| | : | |
| Petitioner, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| KAROLINA MICHELLE | : | |
| HERNANDEZ RIVERA, | : | |
| | : | |
| Respondent. | : | |

## ORDER DENYING PETITIONER'S EX PARTE
## MOTION FOR TEMPORARY RESTRAINING ORDER

This civil case is before the Court on Petitioner's ex parte motion for temporary restraining order. (Doc. 6).

### I. BACKGROUND

The following background is taken from Petitioner's verified complaint and exhibits and is based solely on the Petitioner's perspective. (Doc. 5).

Petitioner and Respondent, never married, were both born in Honduras and were partners from July 21, 2011 until February 21, 2018. (*Id.* at ¶ 7). Petitioner and Respondent have two children, Arles and A.G.H. (*Id.*) A.G.H. was born on November 26, 2014. (*Id.* at ¶ 8). According to Petitioner, from A.G.H.'s birth until February 21, 2018, the family lived together in Honduras, and, immediately before February 21, 2018, resided together at Colonia Quebrada Seca, in the municipality of Choloma, Department of Cortes. (*Id.* at ¶ 9). Respondent, Arles, and A.G.H., however, also spent some

amount of time at Respondent's parents' home in the Department of St. Barbara in Trinidad, Honduras. (*Id.*)

In March 2017, Respondent's sister, Elsa Hernandez, and her husband, Eduardo Aguila, contacted Petitioner about A.G.H., proposing to adopt A.G.H. so he could live with them in California. (*Id.* at ¶ 10). Elsa and Eduardo offered to pay for A.G.H.'s needs. (*Id.*) Petitioner declined the offer. (*Id.*) Respondent was not happy with Petitioner's denial, arguing that A.G.H would have a better future with Elsa and Eduardo. (*Id.* at ¶ 11).

Around one year later, on February 21, 2018, Respondent left home with Arles and A.G.H. (*Id.* at ¶ 12). Petitioner states he "had no advance knowledge of respondent's intention to leave the home with the children, why she left, where they went, or when they would be returning." (*Id.*) When Respondent and the children did not return home, Petitioner filed a report with the Police Department of St. Barbara in Trinidad. (*Id.* at ¶ 13). The Police searched Respondent's parents' house, but Respondent's parents indicated that Petitioner had left for the United States. (*Id.* at ¶ 14).

On February 23, 2018, Petitioner went to the Directorate for Children, Adolescents, and Family to file a migration alert. (*Id.* at ¶ 15). While there, Petitioner received a phone call from Respondent's brother, Denis Hernandez, a United States resident. (*Id.* at ¶ 16). Denis informed Petitioner that he was paying to have Respondent and the children travel to the United States. (*Id.*) Petitioner stated he did not agree and requested the children be returned to him. (*Id.*) Four days later, Respondent dropped Arles off at Petitioner's home. (*Id.* at ¶ 17). A.G.H. remained with Respondent. (*Id.*)

2

On March 6, 2018, Petitioner filed a Hague Abduction Convention Application with the Honduran Central Authority, seeking the return of A.G.H. (*Id.* at ¶ 19). In June 2018, Petitioner filed a demand for the suspension of Respondent's parental rights for both Arles and A.G.H. in a Honduran civil court. (*Id.* at ¶ 20).

On October 23, 2018, Petitioner and Respondent spoke via WhatsApp. (*Id.*) Petitioner did not speak to A.G.H. (*Id.*) In the complaint, Petitioner does not provide any details about that conversation. (*Id.*) The following day, Petitioner filed a second Hague Abduction Convention Application. (*Id.* at ¶ 22).

On January 17, 2019, the U.S. Central Authority ("USCA") electronically received Petitioner's application. (*Id.* at ¶ 23). On January 25, 2019, the USCA confirmed two possible locations for Respondent and A.G.H.: Cincinnati, Ohio and Montebello, California. (*Id.* at ¶ 24). By April 22, 2019, the USCA received information from local authorities in Ohio and California that they were unable to confirm the location of Respondent and A.G.H. (*Id.*) While there was some effort to locate Respondent and A.G.H. over the next 18 months, efforts to locate Respondent and A.G.H. remained unsuccessful. (*Id.* at ¶ 25).

On January 6, 2021, the Honduran Central Authority provided new information to the USCA about a possible address for Respondent and A.G.H. in Cincinnati, Ohio (the "Cincinnati Address"). (*Id.* at ¶ 26). On May 19, 2021, the U.S. Department of State sent a Hague request to the Ohio Bureau of Criminal Investigations ("BCI"). (*Id.* at ¶ 27). Over the next month, the BCI, investigated, sending a report to the USCA on June 17, 2021. (*Id.*)

According to the BCI report, a BCI analyst searched several databases for the Cincinnati Address; however, the address provided no known association with Respondent. (Doc. 6-3 at 54). The BCI supervisor decided to send agents to the Cincinnati Address. (*Id.* at 55).

On June 15, 2021, Special Agents Doug Eveslage and Sean Zint, along with a local Patrol Officer Perkins, made contact at the Cincinnati Address. (*Id.*) SA Eveslage, SA Zint, and Officer Perkins spoke to two teenagers, showing them photos of Respondent and A.G.H. (*Id.*) The two teenagers thought A.G.H. "looked familiar and was possibly their 'cousin.'" (*Id.*) The two teenagers called their father and sent their father the photos of Respondent and A.G.H. (*Id.*) The father indicated—on the premise of anonymity because his family and Respondent's family do not get along—that he recognized Respondent and A.G.H., that they lived near West Clermont High School, and that he and the teenagers had been to their apartment in November 2020. (*Id.*)

The father and the teenagers then provided a general address location and identified three other individuals (two teenagers and their possible mother, Gloria Hernandez) who lived at the address. (*Id.* at 56). SA Zint then contacted a school resource officer in Clermont County Schools, who identified a listed address for Gloria in Batavia, Ohio (the "Batavia Address"). (*Id.*) The teenagers also described Gloria's car as a red Hyundai sedan. (*Id.*)

Later that same day, SA Eveslage and SA Zint drove to the Batavia Address. (*Id.*) Although SA Eveslage and SA Zint located a red Hyundai Sonata, the car was not registered to Gloria. (*Id.*) Although SA Eveslage and SA Zint made contact at the

4

Cincinnati Address, they chose not to attempt contact at the Batavia Address. (*Id.*) SA Eveslage and SA Zint did not report seeing any person—whether or not resembling Respondent, A.G.H., or the other alleged residents of the Batavia Address—while investigating the Batavia Address. (*Id.*) SA Eveslage and SA Zint did not return to the Batavia Address. (*Id.*) The BCI report then concludes that the Batavia Address <u>may</u> be the current address for Respondent and A.G.H. (*Id.*)

On July 15, 2021, after the BCI report was received by USCA, the USCA sent a list of possible attorneys to the Honduran Central Authority. (Doc. 6-3 at 53). Petitioner states he spent the next three months looking for an attorney. (Doc. 5 at ¶ 28). On October 18, 2021, the Legal Aid Society of Southwest Ohio confirmed with the USCA that it agreed to represent Petitioner. (Doc. 6-3 at 53). Petitioner entered into a representation agreement on November 15, 2021. (Doc. 5 at ¶ 29).

Over five months later, Petitioner initiated this action, seeking the return of A.G.H. to Honduras. (Doc. 1). Currently before the Court is Petitioner's ex parte motion for temporary restraining order. (Doc. 6).

## II. STANDARD OF REVIEW

An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction, namely, the Court weighs four factors: (1) strong likelihood of success of the merits; (2) irreparable harm: (3) harm to others; and (4) public interest.

*ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 669–70 (S.D. Ohio 2016) (citing *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id.* (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). Moreover, additional emphasis will be placed on irreparable harm, given that the purpose of a temporary restraining order is to maintain the status quo. *Id.*

"The only type of injunctive relief that a district court may issue ex parte is a temporary restraining order." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993); Fed. R. Civ. P. 65(b). Pursuant to Fed. R. Civ. P. 65(b)(1):

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

*Id.* The "stringent restrictions…on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

## III. ANALYSIS

Before considering the ex parte motion for temporary restraining order, the Court raises a threshold concern: whether the Court may exercise jurisdiction over the petition.

Pursuant to the International Child Abduction Remedies Act ("ICARA"), "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a). When a child is abducted, a person seeking that child's return "may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b).

Some federal courts have interpreted Section 9003(b) as a jurisdictional issue and "dismissed ICARA petitions where children were not located in the jurisdiction of the court at the time the petition was filed." *Skolnick v. Wainer*, No. CV 2013-4694 WFK MDG, 2013 WL 5329112, at *1 (E.D.N.Y. Sept. 20, 2013) (collecting cases). Other courts have referred to Section 9003(b) as a venue provision. *Id*. (collecting cases). However, regardless of whether Section 9003(b) is a jurisdictional or venue provision, Section 9003(b) states that the only place where a court "is authorized to exercise its jurisdiction" is "in the place where the child is located at the time the petition is filed."

Here, the Court is concerned with whether it is authorized to exercise jurisdiction. Since Respondent left Honduras with A.G.H., there have been two possible locations identified for Respondent and A.G.H.: Cincinnati, Ohio and Montebello, California. For this action, Petitioner relies on the BCI report to suggest that A.G.H. was located in

Cincinnati, Ohio at the Batavia Address at the time the petition was filed.  But the June 2021 BCI report does not demonstrate that Respondent and A.G.H. resided at the Batavia Address.  The BCI report concluded that the Batavia Address "may be the current address" of Respondent and A.G.H, and that conclusion is based solely on information from a family who went to the Batavia Address over seven months prior to their identification and who allegedly fear people associated with Respondent, A.G.H. and other purported residents of the Batavia Address. (Doc. 6-3 at 56).[1]  Indeed, when SA Eveslage and SA Zint investigated the Batavia Address, they never saw Respondent or A.G.H. (or any other of the other purported residents of the Batavia Address).

Moreover, the BCI report was generated nearly a year before Petitioner filed the petition, and when the summons was sent to Respondent at the Batavia Address, it was returned as unexecuted.  (Doc. 8).  Thus, even assuming Respondent and A.G.H. resided at the Batavia Address, the amount of time between the BCI report and the filing of the petition raises serious doubts as to whether A.G.H. was located in Cincinnati at the time the petition was filed and whether the Court is authorized to exercise jurisdiction in this case.  (Doc. 8).

---

[1] The BCI report's conclusion is also seemingly based on the family's identification that one of the purported residents of the Batavia Address drives a red Hyundai sedan, and when SA Eveslage and SA Zint investigated the Batavia Address, a red Hyundai Sonata was in the parking lot.  (Doc. 6-3 at 56).  However, the red Hyundai Sonata (a car not necessarily unique to the market) was registered to 25-year-old white female.

But, *even if* the Court is authorized to exercise jurisdiction, Petitioner's ex parte motion for temporary restraining order must be denied because Petitioner fails to demonstrate: (1) the need for ex parte relief; and (2) irreparable harm.

First, ex parte requests should only be granted in the most stringent of circumstances since such requests run afoul to this country's history of jurisprudence requiring notice and opportunity to be heard. *Granny Goose Foods*, 415 U.S. at 439.

Here, Petitioner's counsel states that the motion should be granted without notice to Respondent based on fear that Respondent will continue to conceal herself and A.G.H. from Petitioner if notice is given. (Doc. 6-2 at 14). However, this statement is undercut by the actions of Petitioner and his counsel. The initial package filed by Petitioner included: (1) a motion for leave to proceed in forma pauperis; (2) a civil cover sheet; (3) the complaint; (4) the motion for ex parte temporary restraining order, including the brief in support and exhibits; and (5) a request for issuance of summons. (Doc. 3). Notably, the complaint's certificate of service certifies that (at least) the complaint was served on Respondent at the Batavia Address. (Doc. 5 at 15). Moreover, the request for issuance of summons asks the US Marshals to serve Respondent with <u>all</u> documents in the initial package, so Petitioner asked the US Marshals to serve Respondent with the motion for temporary restraining order. (Doc. 3-9). Thus, Petitioner has already attempted to provide notice to Respondent and fails to demonstrate why relief should be

granted without first providing Respondent with notice and opportunity to be heard.[2]

Second, Petitioner fails to show irreparable harm. "While a Court is permitted to consider other factors, immediacy and irreparability of harm are threshold considerations since a temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo." *Hartman v. Acton*, No. 2:20-CV-1952, -- F. Supp. 3d ---, 2020 WL 1932896, at *2 (S.D. Ohio Apr. 21, 2020) (quotation and citations omitted). "[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013).

Petitioner argues that he will face irreparable harm if the order is not issued because he faces the threat of Respondent hiding or fleeing with A.G.H. As discussed *supra*, any concern with Respondent hiding or fleeing was diminished by Petitioner attempting to notify Respondent of the petition. Also, except for Petitioner's general suggestion that Respondent will flee absent a temporary restraining order, Petitioner has not presented any specific evidence that Respondent is likely to flee. *Diaz v. Ibarra*, No. CV-19-03183-PHX-DWL, 2019 WL 13195849, at *2 (D. Ariz. May 17, 2019) ("Such a showing [that respondent is likely to flee] is usually necessary to obtain a TRO in an ICARA matter.").

---

[2] Although not reflected on the docket, the Court is aware that Petitioner's counsel contacted the Clerk's office around April 29, 2022, raising concerns about the summons being issued to Respondent before the entry of a temporary restraining order. However, counsel's contact came three days too late, as the summons was issued and sent by the U.S. Marshals on April 26, 2022 following Petitioner's initial package. (Doc. 7).

Moreover, while the Court recognizes that Respondent and A.G.H. left Honduras five years ago, and that Petitioner has taken some steps to try and have A.G.H. returned, Petitioner fails to account for his delay when seeking a temporary restraining order. The BCI report found a possible address for Respondent and A.G.H. in June 2021, the USCA sent the Honduran Central Authority a list of possible attorneys in July 2021, the Legal Aid Society of Southwest Ohio informed the USCA that it was representing Petitioner on October 18, 2021, and Petitioner signed a retainer agreement on November 15, 2021. Petitioner and his counsel then waited five months before seeking the emergent relief. Thus, Petitioner's delay in seeking a temporary restraining order weighs against the need for such immediate relief.

As discussed, the Court has serious questions concerning whether the Court is authorized to exercise jurisdiction over the petition because A.G.H.'s location is unknown. Further, even if the Court is authorized to exercise jurisdiction, the Court declines at this time to grant the emergent measure of an ex parte temporary restraining order sought by Petitioner. *Diaz*, 2019 WL 13195849, at *1 (denying without prejudice ex parte motion for temporary restraining order when petitioner failed to provide an address for respondent and failed to show irreparable harm).

The Court has taken significant effort to consider how to proceed in this case given the circumstances surrounding Respondent and A.G.H.'s departure, the unknown nature of A.G.H.'s location, the delay when seeking emergent relief, and the need for notice and opportunity to be heard. First, given all the circumstances in this case, the Court finds it cannot proceed until the Court establishes its authority to exercise

jurisdiction, *i.e.*, an accurate location for Respondent and A.G.H. is determined, and Respondent is made aware of the case. Second, because the Court cannot proceed until a location for A.G.H. is determined, the Court hereby stays the case until such time that Petitioner files a notice with the Court identifying A.G.H.'s location. *See Latta v. U.S. Dep't of Educ.*, No. 2:22-CV-4255, -- F. Supp. 3d ---, 2023 WL 1111896, at *2 (S.D. Ohio Jan. 27, 2023) (included with the court's inherent power to control the disposition of cases on its docket is the ability to issue a stay). Finally, the Court will schedule a status conference with Petitioner's counsel in six months to review efforts to locate A.G.H.

## IV. CONCLUSION

Based upon the foregoing, Petitioner's ex parte motion for temporary restraining order is **DENIED without prejudice**. The case is **STAYED** until such time that Petitioner files a notice identifying the location of A.G.H. A status conference will be set by separate notice.

**IT IS SO ORDERED.**

Date:   3/9/2023                             *s/Timothy S. Black*
                                             Timothy S. Black
                                             United States District Judge